# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| CORY J. THORNTON, | ) | Case No. 4:20-cv-01420-JRA |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | CARMEN E. HENDERSON |
| ANDREW SAUL, Commissioner | ) | |
| of Social Security | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

## I.      Introduction

Cory Thornton, Plaintiff, seeks judicial review of the final decision of Andrew Saul, the Commissioner of Social Security. The Commissioner denied Thornton's application for supplemental security income under Titles II and XVI of the Social Security Act. This matter is before me under 42 U.S.C. § 405(g) and Local Rule 72.2(b). Because the ALJ followed proper procedures and her decision is supported by substantial evidence, I recommend that the Commissioner's final decision be AFFIRMED.

## II.     Procedural History

Thornton applied for disability insurance benefits on March 22, 2017, and for supplemental security income the following day. (ECF No. 10, PageID #: 74). He alleged a period of disability beginning on May 7, 2015, for both claims. (ECF No. 10, PageID #: 74). The Ohio Division of Disability Determination (the "State Agency") initially denied Thornton's claim on June 16, 2017. (ECF No. 10, PageID #: 74). The State Agency denied it again on September 28, 2017, on reconsideration. (ECF No. 10, PageID #: 74). Thornton then requested a hearing before an ALJ. (ECF No. 10, PageID #: 74). ALJ Mary Lohr presided over Thornton's hearing on February 26,

1

2019. (ECF No. 10, PageID #: 74). Thornton appeared through counsel Irene Makridis and testified. (ECF No. 10, PageID #: 104-30). Thornton's wife, Melanie Thornton, also testified. (ECF No. 10, PageID #: 130-43). Brett Salkin testified as an impartial vocational expert. (ECF No. 10, PageID #: 143-48).

The ALJ issued her decision on April 10, 2019. (ECF No. 10, PageID #: 74-85). She determined that Thornton was not disabled under the Social Security Act. (ECF No. 10, PageID #: 74-85). Thereafter, Thornton submitted three sets of post-decision evidence to the Appeals Council (ECF No. 10, PageID #: 64-68) and asked the Appeals Council to review and set aside the ALJ's ruling. The Appeals Council denied Thornton's request on April 30, 2020. (ECF No. 10, PageID #: 56-62). This timely appeal followed. (ECF No. 1). Thornton submitted his brief in support on October 8, 2020.[1] (ECF No. 11). The Commissioner responded on November 9, 2020. (ECF No. 13). Thornton replied on November 23. (ECF No. 14).

## III.  Relevant Background

The ALJ's narratives of the relevant hearing testimony, medical evidence, and opinion evidence provide useful background for this Report and Recommendation. Where it is necessary, the Court augments the ALJ's narratives.

### A.  Salkin's Vocational Expert Testimony

To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked [Salkin] … whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. [Salkin] … testified that[,] given all of

---

[1] Local Civil Rule 16.3.1 limits merits briefs in social security cases to 25 pages. Local Civ. R. 16.3.1(e)(4). Although Thornton certified that his merits brief was 25 pages long, in fact it was 28 pages (discounting page 27, which contains the certificate of service). Because Thornton's brief does not conform to that rule, the Court could decline to review the non-conforming pages. Instead, and for completeness's sake, the Court has considered the contents of these pages in preparing this R&R.

these factors[,] the individual would be able to perform the requirements of representative occupations such as housekeeper, DOT 323.687-014, SVP 2, light, with 134,000 jobs nationally; food service worker, DOT 311.677-010, SVP 2, light, with 105,000 jobs nationally; and mail clerk, DOT 209.687-026, SVP 2, light, with 50,000 jobs nationally.

(ECF No. 10, PageID #: 84).

The ALJ also asked Salkin to opine one whether sufficient jobs existed in the national or local economy that a hypothetical individual with all of the limitations found in Thornton's RFC but limited to only sedentary work could do. (*See* ECF No. 10, PageID #: 147 (stating that it would markedly erode[] the sedentary, unskilled job pace" category)). Salkin testified that such a combination would likely be work preclusive. (ECF No. 10, PageID #: 147). He explained that testimony by stating that the sedentary-work hypothetical essentially "rule[s] out all industrial and manufacturing jobs[,] … hospital jobs, office jobs, [and] farm jobs." (ECF No. 10, PageID #: 147).

Salkin testified that his statements were consistent with the DOT. (ECF No. 10, PageID #: 148).

## B. Medical Evidence

[Thornton] was in a motorcycle accident in May 2015, at which time he broke his leg and ankle, and he underwent ORIF followed by physical therapy (3F/107,204). Due to delayed healing, a bone stimulator was ordered in August 2015 (3F/78). He had the hardware removed in June 2016 (3F/27). In August 2016, he reported that things had greatly improved since having the hardware removed, although he still had some discomfort about the ankle (3F/17).

He has attempted physical therapy and corticosteroid injections. However, he has not seemed to participate in all treatment. In March 2017, he was two years out from his ankle ORIF and nine months out from hardware removal. He reported some lateral ankle pain with ambulation, and no pain with rest. He was given a cortisone injection (5F/12). He sprained his ankle in June 2017 and was given an Aircast (7F/2). MRI of the left ankle in July 2017 showed findings suggestive of bone infarction involving the distal articular

surface of the tibia. There were multiple irregularities at the articular surface of the distal tibia suggestive of multiple nondisplaced subacute to chronic fractures. There was evidence of healing of fractures involving the medial malleolus and finding related to prior internal fixation hardware (7F/14). At follow up on July 27, 2017, he reported pain only with ambulating. He stated he never picked up the lace up ankle sleeve that had been ordered for him (13F/5). He was advised that the MRI showed a cyst that can be monitored, or he could have surgery to clean out the cyst and place a bone graft in place, and the claimant opted to monitor the cyst for now and continued with a brace and pain cream (13F/7). He had an initial pain management evaluation on July 27, 2017 and was started on Norco and gabapentin (9F/5,8). In November 2017, he reported the ankle feels decent when he wears the brace but is worse without the brace. He again opted to continue with NSAIDs and the lace up ankle brace (13F/12).

In terms of low back pain, in December 2016, he was referred for physical therapy for low back pain (3F/11). MRI of the lumbar spine in November 2017 showed multilevel disc disease at L3-4, L4-5, and L5-Sl, protruding discs with central thecal sac effacement at L3-4 and AP stenosis at L4-5 and L5-Sl. He also had posterior lateral extension of L3-4, L4-5, and L5-Sl with posterior lateral extension causing foraminal compromise and nerve effacement and compression, left greater than right, at L3-4 and L4-5 (12F/2). MRI of the cervical spine in December 2017 showed straightening of the cervical lordosis without reversal, no evidence of compromise of formamina, and no evidence of a protruded or extended disc (12F/2).

EMG of the upper extremities in October 2017 was highly suggestive of a C6-7 cervical radiculopathy and mild right carpal tunnel syndrome (15F/95). He was in physical therapy for right shoulder and cervical pain in early 2018 (15F/71). MRI of the brachial plexus in April 2018 showed a broad-based right foraminal disc herniation at C4/5, resulting in significant neuroforaminal narrowing (15F/103). MRI of the right shoulder at the same times showed tendinopathy of the supraspinatus and infraspinatus tendons. There was a small amount of fluid in the subacromial subdeltoid bursa, which may represent bursitis (15F/106). He reported an epidural injection in the cervical spine in May 2018 helped a lot for a couple weeks, but another in September 2018 did not help (16F/26).

He continues with pain management for his left hip, left ankle and foot, low back, and cervical pain. X-rays of the hips were unremarkable (15F/48). He continues to take Percocet up to two

4

times daily, as well as gabapentin and ibuprofen 800mg. He reports that his medications decrease pain and improve functional ability without adverse effects. He received a cervical epidural steroid injection in September 2018 and continued to report significant improvement in his right radicular pain symptoms with improved functional ability, although he had some difficulty lifting with his left arm. He requested another cervical epidural injection (12F/1). Examination in November 2018 showed 5/5 muscle strength throughout, intact reflexes and sensation, negative Faber and negative straight leg raising. He was able to rise from a seated position without difficulty, although his gait was antalgic, and he had difficulty with heel and toe walking. He had tenderness of the bilateral lumbar paraspinous musculature, the bilateral sacroiliac joints, and the left greater trochanter. He had positive lumbar facet loading. However, lumbar flexion and extension were intact. Another epidural steroid injection was ordered (12F/3- 4 ). In November 2018, he was referred for physical therapy for left shoulder pain, and he was referred to physical medicine and rehabilitation (16F/29), but it is unclear whether he followed through with physical therapy.

The claimant is also obese and has sleep apnea for which he uses a CPAP machine nightly (3F/10). He reports he sleeps at least seven hours nightly (15F/4). In July 2018, he weighed 319 pounds, with a BMI of 42.09 (16F/23). In November 2018, he weighed 290 pounds, with a BMI of 38.2 (12F/3). The claimant has chronic migraines since his teen years, for which he treats with a neurologist. He reports having 15-20 migraines per month, with no improvement with Topamax, Inderal, and Elavil (15F/4). In September 2017, he was advised that he may be an excellent candidate for Botox therapy for migraine prophylasis. He was also advised to be compliant with his CPAP, exercise daily, lose weight, avoid migraine triggers, and practice good sleep hygiene (15F/9; duplicate at 14F). In January 2018, he reported he was taking Imitrex approximately 10 days per month, and it worked sometimes. Mag[nesium] oxide was added at that time (14F/10,13; 15F/39). He received a Botox injection in February 2018, and at follow up in April 2018, he reported no improvement with the Botox injection (15F/66,119). He was started on nortriptyline in April 2018, but he reported no improvement (14F/16). In August 2018, he reported he was only sleeping around four hours nightly (14F/ 17). He was advised that he would be an excellent candidate for CGRP inhibitors, and his neurologist discussed Aimovig, to which he was agreeable (14F/20).

There are records of treatment at PsyCare dating back to January 2016. At that time, he was diagnosed with mild recurrent major

depression and PTSD (2F/11). He reported he went to Las Vegas in March or April of 2016. He reported he had been interacting more with others. He reported he felt a little better on the fluoxetine. He also reported he was working a bit the last month, so his mood was better (2F/4). In May 2016, he reported he continued to work and otherwise stayed in his room (17F/5). However, he did not return again for treatment until November 2017 (17F/8). He reported he was married and living with his wife and stepdaughter. He reported no close friends other than family members (17F/11). His mental status exam noted he was depressed with poor self-esteem. However, he had normal activity, intact comprehension, was oriented, with adequate speech, average intellectual functioning, fair insight and judgment, and was appropriate and cooperative (17F/13). At that time, he was diagnosed with only Major depressive disorder, single episode, severe (17F/15), although PTSD was added back in in December 2017 (17F/20).

In January 2018, he reported difficulty with abstract meaning, reading and writing. He stated a man that he called grandpa passed away last week (17F/24). He is noted to have negative thought patterns emphasizing themes of helplessness, hopelessness, and self-criticism (17F/39). He continued to receive counseling every two weeks but was not prescribed medications (17F/42). He reports difficulties understanding, remembering or getting what others say (17F/45). In April 2018, he was seen for medication management, and he was started on Latuda and citalopram (17F/49). On April 30, 2018, he reported getting back from a five-day cruise with his wife and mother. He stated he wanted to spend more time with his mom while he can (17F/50). In June 2018, he discussed his history of working in a funeral home, and he was noted to have very good deductive reasoning skills (17F/59). He was switched from citalopram to Cymbalta in June 2018 (17F/64). In July 2018, he reported he went to Cincinnati to pick up his wife's daughter to bring her home (17F/67). He also reported he went to Mansfield because his friend is doing comedy there (17F/70). He has some issues with his relationship with his wife and feeling disrespected (17F/73). He reported mowing the lawn (17F/78). He reported he gets depressed due to pain (17F/104). As of November 2018, he was taking Wellbutrin, Cymbalta, and Latuda (17F/109).

The claimant had a consultative evaluation with Kenneth Gruenfeld, PsyD[,] on April 20, 2017. Dr. Gruenfeld noted the claimant's mood and affect appeared depressed as evidenced by his lack of motivation, problems with concentration, social isolation, sadness, feelings of worthlessness, and anhedonia. However, he did have any signs of anxiety, and he maintained appropriate eye contact and did

not exhibit hostile or aggressive behavior. He was well oriented and provided autobiographical detail. He exhibited good concentration, as evidenced by his ability to maintain good eye contact, answer questions, and consistently remain on topic. He recalled three of three objects after fifteen minutes and recalled five digits forward and four digits backward. Dr. Gruenfeld diagnosed Major Depressive Disorder and Borderline Intellectual Functioning (4F). A few months later, on September 18, 2017, the claimant had cognitive testing with Joseph Konieczny, PhD. The claimant attained a Full Scale IQ score of 53, placing him in the extremely low range of functioning. His scores ranged from 50 on Processing Speed to 66 on Verbal Comprehension. Dr. Konieczny diagnosed Borderline Intellectual Functioning (10F). High school records indicate a Full Scale IQ of 71 (lF/5).

(ECF No. 10, PageID #: 79-82).

### C.    Opinion Evidence

[T]he [State Agency] consultants indicated a range of light exertion with occasional foot controls on the left, no ladders, occasional stairs, frequent balancing, crouching, and crawling, no hazards, simple tasks, no fast pace, occasional interaction, and static work (5A)…

The psychological consultative examiner, Kenneth A. Gruenfeld, PsyD[,] indicated the claimant's task comprehension will be an issue in the future, and problems with focus, comprehension, and motivation would impact his ability to consistently carry out future job tasks. He has the capacity to complete simple job tasks that he understands. He is likely to be able to perform adequately in work setting with minimal social requirements. It is likely that an increase in stress or pressure would increase his mood symptoms and consistency of task performance will worsen as stress heightens (4F)…

Psychological consultative examiner, J. Joseph Konieczny opined that the claimant would have some limitations in understanding, remembering, and carrying out instructions and would have difficulty maintaining focus and persistence on moderate to complex multi-step tasks. He would have some diminished tolerance for frustration and diminished coping skills, which would impact his ability to respond to severe supervision and interpersonal situations in the work setting. He would seem capable of responding appropriately to normal such situations. He would have diminished tolerance for frustration and diminished coping skills, which would

impact his ability to respond to severe pressure situations in the work setting. He would seem capable of responding appropriately to normal such situations (10F)…

(ECF No. 10, PageID #: 82-83).

## IV. The ALJ's Decision

As is relevant here, the ALJ issued the following findings of fact and narrative analysis:

> 3.     The claimant has the following severe impairments: Degenerative disc disease, Obesity, Migraines, Depression, Bi-polar, Attention deficit hyperactivity disorder (ADHD), Sleep apnea, Left ankle fracture post ORIF and removal of hardware (20 CFR 404.1520(c) and 416.920(c))…
>
> 4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> No treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment. In reaching the conclusion that the claimant does not have an impairment or combination of impairments that meet or medically equal a listed impairment, the undersigned also considered the opinion of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion (20 CFR 404.1527(f), 416.927(f) and Social Security Ruling 96-6p). All of the listings were considered in reaching this finding, with specific emphasis on Listing 1.02 and 1.04. The claimant's ankle impairment was evaluated under the criteria found in listing 1.02(A). Because he does not have significant limitation of motion, and because he can ambulate effectively under the criteria of 1.00B(2)(b), the impairment does not meet the listing level. The degenerative disc disease does not meet the listing of 1.04, as there is no credible evidence of nerve root compression, such as consistently positive straight leg raising tests, consistent radicular findings in a dermatomal pattern in the upper extremities, or a positive EMG. There is no evidence or diagnosis of arachnoiditis or stenosis resulting in pseudoclaudication.
>
> In reaching the conclusion that the claimant's impairments do not rise to listing level, the undersigned also considered the effect that

the claimant's obesity has on the other impairments and on the claimant's ability to perform routine movement and necessary physical activity within the work environment. The undersigned also considered how the claimant's obesity may cause fatigue that would affect the ability to function physically pursuant to Social Security Ruling 02-1p. Because the physical examinations contained in the record were mostly unremarkable, the undersigned does not find that the claimant's obesity, either singularly or in combination with the claimant's other medically determinable severe impairments, results in limitations greater than those assessed in this opinion.

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.04. In making this finding, the undersigned has considered whether the 'paragraph B' criteria are satisfied. To satisfy the 'paragraph B' criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.

In understanding, remembering, or applying information, the claimant has moderate limitations. The claimant alleged that he has difficulty remembering generally, understanding what is said to him, following instructions, completing tasks, and paying bills. However, the claimant also stated that he could perform simple maintenance, use a microwave, go to doctor's appointments, take medications, shop, drive, and read. In addition, the record shows that the claimant was able to provide information about his health, describe his prior work history, follow instructions from healthcare providers, respond to questions from medical providers, and there is any mention of any issues with the claimant's short- or long-term memory.

In interacting with others, the claimant has moderate limitations. Here, the claimant alleged that he has difficulty engaging in social activities, getting along with others, and spending time in crowds. However, according to his statements, the claimant is also able to get along with others, shop, spend time with friends and family, deal appropriately with authority, and live with others. Finally, the medical evidence shows that the claimant had a good rapport with providers, was described as pleasant and cooperative, and had good

9

interactions with non-medical staff.

The next functional area addresses the claimant's ability to concentrate, persist, or maintain pace. For this criterion, the claimant has moderate limitations. The claimant contended that he has limitations in concentrating generally, focusing generally, following instructions, and completing tasks. On the other hand, the claimant said that he is also able to drive, watch TV, read, and handle his own medical care. Additionally, the record fails to show any mention of distractibility.

Finally, the claimant has moderate limitations in his ability to adapt or manage himself. The claimant asserted that he has difficulties managing his mood. That said, the claimant also stated that he is able to handle self-care and personal hygiene. Meanwhile, the objective evidence in the record showed the claimant to have appropriate grooming and hygiene, no problem getting along well with providers and staff, normal mood and affect, and no problems with temper control.

Because the claimant's mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria are not satisfied.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can operate foot controls with the left foot occasionally. He can never reach overhead to the right. He can climb ramps and stairs occasionally, never climb ladders, ropes, or scaffolds, crouch frequently, and crawl frequently. He can never work at unprotected heights or with moving mechanical parts. He is able to perform simple, routine, repetitive tasks but not at a production rate pace (e.g. assembly line work). He is able to interact with supervisors, coworkers, and the public occasionally. He is able to tolerate few changes in a routine work setting…

[The State Agency medical consultants' opinions are] given great weight, as [they are] … consistent with the medical evidence of record and the claimant's activities of daily living…

[Gruenfeld's] is given some weight, as it is consistent with Dr. Gruenfeld's evaluation of the claimant…

[Konieczny's] opinion is given partial weight to the extent that it is consistent with the above residual functional capacity. Due to

intellectual limitations and depression, he is limited to simple, routine, repetitive tasks, with no production rate pace and few workplace changes, and only occasional interaction…

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)…

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a)…

11.      The claimant has not been under a disability, as defined in the Social Security Act, from May 7, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(ECF No. 10, PageID #: 76-78, 82-84).

## V.      Law and Analysis

### A.      Standard of Review

The Court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is "more than a scintilla" of relevant evidence; a reasonable person "might accept [it] as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "It is well established that the party seeking remand bears the burden of showing that a remand is proper…" *Oliver v. Sec'y of Health and Hum. Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence; if the Commissioner's findings as to any fact are supported by substantial evidence, then those findings are conclusive. 42 U.S.C. § 405(g); *see Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference…"). The decisive

question is whether the ALJ's conclusions are "substantially supported in the record." *Rogers*, 486 F.3d at 241. If so, then the court must affirm the Commissioner's findings, even if the court does not agree with the Commissioner's decision, or substantial evidence exists to support an alternative result. *Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without the court second guessing him. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) ("An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."). Thus, the movant bears the burden of demonstrating that the ALJ's analysis *lacks* substantial evidence, not merely that substantial evidence supports her position, too. *See Greene ex rel. Greene v. Astrue*, No. 1:10-cv-414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010) ("[A] claimant does not establish a lack of substantial evidence by pointing to evidence … that supports her position. Rather, [a claimant] must demonstrate that there is not sufficient evidence … that would allow a reasonable mind to accept the ALJ's conclusion.").

Despite this deference, a court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards, *i.e.*, "fails to follow its own regulations," unless the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006). Legal error is not harmless if the "error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* And the court will not remand a case for further administrative proceedings absent prejudice on the merits or a deprivation of substantial procedural rights. *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). Similarly, if the ALJ failed to "build an accurate and logical bridge between the evidence and the result," then the court cannot uphold the ALJ's

12

decision, even one supported by substantial evidence. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (citing *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)). This and other 6th Circuit District Courts follow *Sarchet*'s logical-bridge requirement[2] because it ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

B.    **Issues Presented**

Thornton raises three issues:

I.    At step 2, the ALJ erred by failing to find plaintiff's avascular necrosis, bone infarction and posttraumatic arthritis of the left ankle severe impairments. The ALJ failed to consider these impairments either severe or non-severe. The ALJ's Unfavorable Decision is not based upon substantial evidence due to these errors.

---

[2] *E.g. Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

II.     At step 2, the ALJ erred by not finding plaintiff's low IQ a severe impairment. At step 3 the ALJ erred by not finding plaintiff's low IQ meets Listing 12.05. At step 3 the ALJ erred by not finding that plaintiff meets/equals Listing 12.02. The ALJ's finding that Plaintiff has a 12th grade education is not supported by substantial evidence as he has a 12th grade special education and has a low IQ. Therefore, the ALJ's Unfavorable Decision is not based upon substantial evidence due to these errors.

III.    At step 5, the ALJ failed to address the work limitations imposed by the migraines and the extent that the plaintiff would be off task. Not taking the migraine limitations into consideration in her hypothetical question is an error of law. Thus, the ALJ's decision is not based upon substantial evidence.

(ECF No. 11, PageID #: 1359).

### C.     Substantial Evidence Supports the ALJ's Findings Related to Thornton's Left-Ankle Impairments

Thornton's first issue concerns his avascular necrosis, bone infarction, and posttraumatic arthritis of the left ankle. (ECF No. 11, PageID #: 1376-80). Generally, Thornton argues that the ALJ erred at Step Two by not finding that those impairments are severe (or non-severe). (ECF No. 11, PageID #: 1377). But Thornton's Step Two argument ultimately concerns the ALJ's decision to limit Thornton to light—rather than sedentary—work. (ECF No. 11, PageID #: 1377). Thornton notes that Salkin, in his role as a vocational expert, testified that someone with Thornton's limitations would be able to perform only sedentary work, then that individual would not be able to work; thus, had the ALJ limited Thornton to sedentary work because of his ankle impairments, then the ALJ would have had to find that Thornton was disabled. (ECF No. 11, PageID #: 1377).

Alternatively, Thornton argues that the ALJ failed to resolve an evidentiary discrepancy "between the reading of the MRI between the radiologist and Dr. Gentile the orthopedic surgeon…" (ECF No. 11, PageID #: 1379). Thornton argues that this discrepancy "requires remand for the ALJ to consider and address any discrepancies and the weight given to th[ose]

14

opinions…" (ECF No. 11, PageID #: 1379). Additionally, Thornton asserts that "[a] Medical Expert (ME) must be called to review the July 18, 2017, MRI report read by the radiologist, and the findings, assessment and plan of the orthopedic surgeon." (ECF No. 11, PageID #: 1379-80). Finally, Thornton states that

> [t]he ME will advise the ALJ as to whether the avascular necrosis/bone infarction/posttraumatic arthritis is/are the medically determinable impairments, the limitations imposed after reviewing the record as a whole, address the pain and fall reports of plaintiff, and opine whether or not the plaintiff meets or equals a listing including, but not limited to Listing 1.02.

(ECF No. 11, PageID #: 1380). Thornton does not support any of those assertions with case law or statutory or regulatory authority.

The Commissioner responds that there is no error here because the ALJ found that Thornton had other severe impairments—eight of them, in fact—and proceeded to consider Thornton's claim at Step Three, Step Four, and Step Five. (ECF No. 13, PageID #: 1399 (citing *Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987))). The Commissioner also notes that "[t]he ALJ specifically noted the history of other impairments, but ultimately did not find severe, including cervical radiculopathy, right carpal tunnel syndrome, and post-traumatic stress disorder (PTSD) (Tr. 24-28)," findings to which Thornton does not object. (ECF No. 13, PageID #: 1399-1400).

### 1.    The ALJ Properly Considered Thornton's Left-Ankle Impairments

At Step Two, the Commissioner must determine whether the claimant has a severe impairment. 20 C.F.R. § 404.1520(a)(4)(ii). The Sixth Circuit construes the Step Two severity regulation as a "*de minimis* hurdle" (*Rogers*, 486 F.3d at 243, n. 2 (internal quotation marks and citation omitted)), which is intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985). Thus, if an impairment has "more than a

15

minimal effect" on the claimant's ability to do basic work activities, then the ALJ must treat it as "severe." Soc. Sec. Rul. 96–3p, 1996 WL 374181 at * 1 (1996). Inversely, "[a] non-severe impairment is defined by the regulations as an impairment that "does not significantly limit [a claimant's] physical or mental ability to do basic work activities." *Katona v. Comm'r of Soc. Sec.*, No. 14-CV-10417, 2015 WL 871617, *6 (E.D. Mich. Feb. 27, 2015) (quoting 20 C.F.R. § 404.1521(a)).

After an ALJ makes a finding of severity as to even one impairment, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe." Soc. Sec. Rul. 96–8p, 1996 WL 374184, at *5 (1996). If the ALJ fails to consider a claimant's non-severe impairments at a later step, then that is grounds for remand. *See White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787-89 (6th Cir. 2009) ("Because the ALJ does not accurately state the evidence used to support his finding, his total discounting of the mental impairment is not supported by substantial evidence."). But if an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, then an ALJ's failure to list an impairment as a severe impairment at Step Two does "not constitute reversible error." *Maziarz*, 837 F.2d at 244. A Step Two error is subject to harmless-error review. *See Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020) ("An erroneous finding of nonseverity at step two is therefore harmless where the ALJ properly considers nonsevere impairments at later steps.").

The ALJ found at Step Two that Thornton had the following eight severe limitations: "Degenerative disc disease, Obesity, Migraines, Depression, Bi-polar, Attention deficit hyperactivity disorder (ADHD), Sleep apnea, Left ankle fracture post ORIF and removal of hardware." (ECF No. 10, PageID #: 76). The ALJ stated that "[t]he above medically determinable impairments significantly limit [Thornton's] ability to perform basic work activities as required by

16

SSR 85-28." (ECF No. 10, PageID #: 76). The ALJ did not list Thornton's non-severe limitations, nor did the ALJ specifically include left-ankle avascular necrosis, left-ankle bone infarction, or left-ankle posttraumatic arthritis in the list of Thornton's severe impairments.

Nevertheless, it appears that the severe impairment "Left ankle fracture post ORIF and removal of hardware" are broadly drawn, such that they encompass these more particular diagnoses. As his brief makes clear, Thornton's left-ankle avascular necrosis, left-ankle bone infarction, and left-ankle posttraumatic arthritis stem directly from his left-ankle injury after a motorcycle accident. (ECF No. 11, PageID #: 1360, 1364). Thornton's doctors treated that injury by surgically repairing Thornton's left ankle by a surgical technique known as ORIF—open reduction, internal fixation. (ECF No. 11, PageID #: 1364). During the procedure, doctors installed hardware in Thornton's left ankle; when it was determined that the hardware screws were loose, which caused pain, the hardware was removed. (ECF No. 11, PageID #: 1360, 1364). And an MRI later revealed that there was "evidence of healing fractures … related to prior internal fixation hardware." (ECF No. 11, PageID #: 1366 (citing ECF No. 10, PageID #: 746)).

But even if the ALJ should have separated out and listed Thornton's left-ankle avascular necrosis, left-ankle bone infarction, or left-ankle posttraumatic arthritis as individual severe impairments—*i.e.*, if the ALJ erred at Step Two—then such an error is harmless. *Emard*, 953 F.3d at 852. The ALJ's decision demonstrates that she properly considered the exertional and postural limitations caused by Thornton's severe and non-severe left-ankle impairments. For instance, at Step Three, the ALJ stated that Thornton's "ankle impairment was evaluated under the criteria found in Listing 1.02(A). Because he does not have significant limitation of motion, and because he can ambulate effectively under the criteria of 1.00B(2)(b), the impairment does not meet the

17

listing level."[3] (ECF No. 10, PageID #: 77).

Similarly, in fashioning Thornton's RFC, the ALJ noted that Thornton alleged "that he is always in pain and has difficulty walking, standing, and otherwise putting weight on his ankle." (ECF No. 10, PageID #: 79). She also noted, though, that while Thornton "stated that he falls frequently, … that is not completely consistent with the medical record." (ECF No. 10, PageID #: 79). For instance, the ALJ noted that Thornton sprained his ankle in 2017; that a left-ankle MRI "showed findings suggestive of bone infarction[4] involving the distal articular surface of the tibia"; that there were "irregularities at the articular surface of the distal tibia suggestive of multiple nondisplaced subacute to chronic fractures"; that his orthopedist "advised [Thornton] that the MRI showed a cyst that can be monitored, or he could have surgery to clean out the cyst and place a bone graft in place, [but that Thornton] … opted to monitor the cyst for now and continued with a brace and pain cream." (ECF No. 10, PageID #: 80). Additionally, the ALJ pointed out that Thornton stated that his ankle impairment "had greatly improved since having the hardware

---

[3] While Thornton states in passing that his left-ankle impairments "meets or equals … listing 1.02," his support for that statement is two conclusory sentences that parse the medical evidence to favor such a conclusion. But the ALJ's Step Three analysis is subject to substantial evidence review. *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 364-66 (6th Cir. 2014). Thus, to challenge the ALJ's finding, Thornton must do more than merely "pointing to evidence … that supports h[is] position. Rather, [he] must demonstrate that there is not sufficient evidence … that would allow a reasonable mind to accept the ALJ's conclusion." *Greene*, 2010 WL 5021033, at *4. Thornton does not do so. Despite her limited analysis of this listing, the ALJ's overall analysis of Thornton's left-ankle impairments and current functional ability provides enough for the Court to conclude that it is supported by substantial evidence notwithstanding the evidence to which Thornton points. *Forrest*, 591 F. App'x at 366. If substantial evidence supports either conclusion, then the ALJ's finding will be affirmed because the ALJ operated within her zone of choice. *Mullen*, 800 F.2d at 545. That is the case here.

[4] As the parties mention, "avascular necrosis and bone infarction are both types of osteonecrosis (death of the bone)." (ECF No. 11, PageID #: 1377); (*see also* ECF No. 13, PageID #: 1399-1400).

removed, although he still had some discomfort about the ankle"; that "he has not seemed to participate in all treatment"; that he "stated [that] he never picked up the lace up ankle sleeve that had been ordered for him"; that Thornton opted to stick to a conservative treatment course because "the ankle feels decent when he wears the brace but is worse without the brace." (ECF No. 10, PageID #: 80). Concerning Thornton's functional limitations, the ALJ noted that in November 2018 Thornton "was able to rise from a seated position without difficulty [but that] … his gait was antalgic[] and he had difficulty with heel and toe walking." (ECF No. 10, PageID #: 81). Relatedly, the ALJ noted that Thornton's pain "medications decrease pain and improve functional ability without adverse effects." (ECF No. 10, PageID #: 80). Thus, the Court concludes that the ALJ properly considered the full scope of Thornton's left-ankle impairments and how those impairments translated to functional limitations, if any, which satisfies her duty to consider a claimant's severe and non-severe impairments in each subsequent step.[5] *Emard*, 953 F.3d at 852.

In reaching this conclusion, the Court does not ignore Thornton's argument that standing for up to six hours of an eight-hour work day with occasional breaks—which light work can entail[6]—may "stress the [dead ankle] bone to the point [that] it will continue to fracture and eventually break." (ECF No. 11, PageID #: 1379). Nor does the Court ignore Thornton's obesity

---

[5] Additionally, it is well established in this Circuit that "an ALJ need not specifically discuss all nonsevere impairments in the residual-functional-capacity assessment when the ALJ makes clear that her decision is controlled by SSR 96-8p." *Emard*, 953 F.3d at 851-52. The ALJ did so here, specifically noting that "[i]n making this [RFC] finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p)." (ECF No. 10, PageID #: 76).

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b); 20 C.F.R. § 416.967(b).

19

and the exacerbating effect that that condition could have on his left-ankle impairments. Rather, the Court's conclusion stems from the fact that Thornton has not pointed to a medical opinion or other evidence that indicates that his left-ankle impairments *presently* limit his ability to perform light work as modified in the RFC. As such, Thornton's argument for greater functional limitations, including a finding that he should be limited to sedentary work, is merely supposition; it would invite the Court or the ALJ to previse that Thornton's functional capacity might decline and find him to be disabled now based on that prediction. It is well established that, in determining a claimant's current residual functional capacity from the properly developed record before her, an ALJ cannot make medical judgments or play doctor. *See Meece v. Barnhart*, 192 Fed. App'x 456, 465 (6th Cir. 2006) ("[J]udges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor."). And it is equally well settled that "a diagnosis alone is not enough to establish specific functional limitations as a matter of right." *Teresa F. v. Saul*, No. 1:18-cv-01967-JRS-MPB, 2019 WL 2949910, *5, n. 7 (S.D. Ind. July 9, 2019); *see also* Soc. Sec. Ruling 16–3p, 2016 WL 1119029, at *2 (2016) ("Under our regulations, an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability.").

While the Court appreciates Thornton's condition and notes that he may reapply for benefits if his condition worsens, the Court nevertheless concludes that the ALJ's narrative demonstrates that she properly considered Thornton's left-ankle avascular necrosis, left-ankle bone infarction, and left-ankle posttraumatic arthritis. As such, any Step Two error here was harmless. *Emard*, 953 F.3d at 852. Relatedly, Thornton fails to show that these impairments, whether severe or not, materially affect his present ability to perform light work as modified by the RFC that the ALJ found. Thus, substantial evidence supports the ALJ's RFC as it pertains to

20

Thornton's left-ankle impairments.

### 2. There Is No Material Evidentiary Discrepancy Between the Readings of Thornton's MRI

Thornton also argues that his claim should be remanded to the ALJ so that she could resolve an evidentiary discrepancy "between the reading of the MRI between the radiologist and Dr. Gentile the orthopedic surgeon…" (ECF No. 11, PageID #: 1379). Thornton also would have the ALJ call a medical examiner to opine on the matter. (ECF No. 11, PageID #: 1380). But Thornton does not cite *any* authority for this position. Because Thornton's argument is conclusory and unsupported, it is waived.[7]

But even if it were not waived, the argument is meritless. Evidentiary discrepancies occur in most claims. If an ALJ encounters one, then the ALJ *may*: (1) recontact a treating source; (2) request additional existing evidence; (3) require the claimant to undergo a consultative exam at the Commissioner's expense; or (4) ask the claimant or others for more information. 20 C.F.R. § 404.1520b(b)(2)(i-iv); 20 C.F.R. § 416.920b(b)(2)(i-iv). But those actions are discretionary; indeed, they are unnecessary if the ALJ can "determine whether [the claimant is] disabled based on the evidence [that the ALJ] ha[s]." 20 C.F.R. § 404.1520b(b)(1); 20 C.F.R. § 416.920b(b)(1). Looking closely at the radiologist's MRI findings and the orthopedist's assessment and plan in light of those findings, the Court finds that there is no material evidentiary discrepancy here. Both noted the prior ankle fracture, abnormal brightness on a T2 image of the lateral aspect of the distal

---

[7] In *Hollon v. Comm'r of Soc. Sec.*, the Sixth Circuit declined to review the substance of an argument that the petitioner had "made little effort to develop … in her brief." 447 F.3d 477, 491 (6th Cir. 2006). The court noted that it "decline[d] to formulate arguments on [the petitioner]'s behalf, or to undertake an open-ended review of the entirety of the administrative record to determine (i) whether it might contain evidence that arguably is inconsistent with the [ALJ]'s decision, and (ii) if so, whether the [ALJ] sufficiently accounted for this evidence." *Id.* Instead, the court "limit[ed its] consideration to the particular points that [the petitioner] appears to raise…" *Id.* So too here, as Thornton does not support his assertions.

tibia, multiple cortical irregularities, and evidence of healing fractures. (ECF No. 10, PageID #: 826, 1033). While the orthopedist's opinion may give a more detailed diagnosis (for example, stating that Thornton had a bone infarction), the readings do not materially differ. And in any case, the ALJ noted and sufficiently narrated this record. (ECF No. 10, PageID #: 80 (citing ECF No. 10, PageID #: 1033)). As such, Thornton's assertion that the ALJ failed to resolve an evidentiary discrepancy is meritless.

### D. The ALJ Properly Considered the Effects of Thornton's IQ on his Ability to Work

In his second issue, Thornton initially argues that the ALJ again erred at Step Two by failing to find a particular impairment to be a severe impairment—this time, Thornton's IQ. Additionally, Thornton argues that the ALJ erred in failing to expressly analyze his claim under Listings 12.02 and 12.05. (ECF No. 11, PageID #: 1380-82). Thornton alleges that State Agency examiner J. Joseph Konieczny, Ph.D., who determined in September 2017 that Thornton's IQ was only 53, "was never given the plaintiff's school records indicating a Full Scale IQ of 71, on June 13, 2002." (ECF No. 11, PageID #: 1381). Because of "the ALJ's reliance on the flawed report," Thornton argues that "the ALJ's [listing finding] is not based on substantial evidence…" (ECF No. 11, PageID #: 1381).

The Commissioner concedes that the ALJ did not explicitly discuss Listing 12.05 (or 12.02, for that matter) in her decision. (ECF No. 13, PageID #: 1406). Nevertheless, the Commissioner argues that failing to explicitly discuss either listing is not in and of itself error—and is at most harmless error in this case. (ECF No. 13, PageID #: 1406 (citing *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013) and *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990))). Additionally, the Commissioner notes that no State Agency psychological consultant opined that Thornton met any listing. (ECF No. 13, PageID #: 1407). Finally, the Commissioner argues that

because the ALJ explicitly analyzed the "paragraph B" criteria under Listing 12.04—which is identical to the "paragraph B" criteria under Listings 12.02 and 12.05—and narrated her reasons for finding that Thornton did not satisfy that criteria, the ALJ's overall decision on the mental listings is supported by substantial evidence. (ECF No. 13, PageID #: 1408-10).

### 1.    The ALJ Did Not Err in Considering Thornton's IQ

As analyzed above, a Step Two error is grounds for reversal only if the ALJ fails to consider a claimant's non-severe impairments at a later step. *White*, 312 F. App'x at 787-89. And any Step Two error is subject to harmless-error review. *See Emard*, 953 F.3d at 852. The ALJ did not list Thornton's IQ as a severe (or non-severe) impairment at Step Two. As with issue one, whether or not the ALJ should have found that Thornton's IQ was a severe impairment at Step Two is immaterial because the ALJ found other severe impairments and proceeded to the next steps in the evaluation process. *Id.* Thus, the Court must review whether the ALJ properly considered Thornton's IQ in subsequent steps. *Id.*

The Court concludes that the ALJ properly considered Thornton's IQ. At Step Three, the ALJ noted that while Thornton "alleged that he has difficulty remembering generally, understanding what is said to him, following instructions, completing tasks, and paying bills," the evidence also demonstrated that Thornton could "perform simple maintenance, use a microwave, go to doctor's appointments, take medications, shop, drive, and read." (ECF No. 10, PageID #: 77). And in the RFC analysis narratives, the ALJ explicitly discussed Thornton's IQ—both his school records (which indicated an IQ of 71) and a 2017 consultative examination by Kenneth Gruenfeld, Psy.D. (which indicated an IQ of 53). (ECF No. 10, PageID #: 81). In fashioning the RFC, the ALJ reasonably balanced the evidence supporting Thornton's low IQ with the evidence that he successfully navigates his daily activities, such as being "able to get along with others,

shop, spend time with friends and family, deal appropriately with authority, and live with others." (ECF No. 10, PageID #: 78). Together, these discussions demonstrate to a subsequent reviewer that the ALJ properly and sufficiently considered Thornton's IQ after Step Two. *Maziarz*, 837 F.2d at 244. Accordingly, any error at Step Two is harmless. *Emard*, 953 F.3d at 852.

### 2. The ALJ's Failure to Expressly Consider Listings 12.02 or 12.05 Does Not Require Remand

At Step Three, the ALJ "asks whether the claimant satisfies a listed disability." 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. § 416.920(a)(4)(iii). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Commissioner considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). If a claimant's impairments meet or equal a listed condition, then the ALJ must find him disabled. *Id.*

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See e.g. Lett v. Colvin*, 1:13-CV-2517, 2015 WL 853425 at * 15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers*, 582 F.3d at 652. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). A claimant is also disabled if his impairment is the medical equivalent of a listing (20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5)), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

As the Sixth Circuit put it in *Sheeks v. Comm'r of Soc. Sec.*,

> The listings … streamline the decision process by shifting the focus

24

> away from the individual's ability to work and onto his impairments…. The relevant regulations require the ALJ to find a claimant disabled if he meets a listing. Yet they do not require the ALJ to address every listing—and with ample reason. There are a hundred or so listings. In the normal course, as a result, the ALJ need not discuss listings that the applicant clearly does not meet, especially when the claimant does not raise the listing before the ALJ. If, however, the record "raise[s] a substantial question as to whether [the claimant] could qualify as disabled" under a listing, the ALJ should discuss that listing.

544 F. App'x at 641. Put another way, the claimant "must do more than show that the ALJ's decision leaves open the question whether he meets [that] listing[;] … [h]e must show that the open question is a *substantial* one that justifies a remand." *Id.* (citing *Abbott*, 905 F.2d at 925.

For the reasons to follow, the Court concludes that Thornton's claim does not raise a substantial question as to whether he qualifies as disabled under Listings 12.02 or 12.05, such that the Court should remand the case.

### a. The ALJ Expressly Analyzed Thornton's Impairments Under Listing 12.04

The ALJ determined that Thornton was not disabled under Listing 12.04, which concerns depressive disorders, bipolar disorders, and related disorders. (ECF No. 10, PageID #: 77-78). Claims for disability under Listing 12.04 must satisfy either part 1 or part 2 of the following "paragraph A" criteria:

> A. Medical documentation of the requirements of paragraph 1 or 2:
>
> 1. Depressive disorder, characterized by five or more of the following:
>
> a. Depressed mood;
>
> b. Diminished interest in almost all activities;
>
> c. Appetite disturbance with change in weight;
>
> d. Sleep disturbance;

25

e. Observable psychomotor agitation or retardation;

f. Decreased energy;

g. Feelings of guilt or worthlessness;

h. Difficulty concentrating or thinking; or

i. Thoughts of death or suicide.

2. Bipolar disorder, characterized by three or more of the following:

a. Pressured speech;

b. Flight of ideas;

c. Inflated self-esteem;

d. Decreased need for sleep;

e. Distractibility;

f. Involvement in activities that have a high probability of painful consequences that are not recognized; or

g. Increase in goal-directed activity or psychomotor agitation.

20 CFR Part 404, Subpart P, Appendix 1, Listing 12.04. Additionally, the claimant must demonstrate that they meet either the "paragraph B" or "paragraph C" criteria:

B. Extreme limitation of one, or marked limitation[8] of two, of the following areas of mental functioning (*see* 12.00F):

1. Understand, remember, or apply information (*see* 12.00E1).

2. Interact with others (*see* 12.00E2).

3. Concentrate, persist, or maintain pace (*see* 12.00E3).

---

[8] A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis. *See* 20 C.F.R. § 404.1526a(e); 20 C.F.R. § 416.926a(e).

4. Adapt or manage oneself (*see* 12.00E4). OR

C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and

2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 CFR Part 404, Subpart P, Appendix 1, Listing 12.04. The claimant must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C. *See* 20 CFR Part 404, Subpart P, Appendix 1, Listing 12.00A2; Listing 12.04.

The ALJ found that Thornton was not disabled under Listing 12.04 because he did not demonstrate that his condition met either the "paragraph B" or "paragraph C" criteria. (ECF No. 10, PageID #: 77-78). The ALJ found that Thornton was only *moderately* limited in each of the four "paragraph B" areas of functioning. (ECF No. 10, PageID #: 77-78). The ALJ then found that Thornton did not meet the "paragraph C" criteria, either, stating that "[t]he record does not show minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life." (ECF No. 10, PageID #: 78).

Thornton has not challenged the ALJ's analysis of Listing 12.04 in a material way, including her "paragraph B"[9] or "paragraph C" findings. In any case, the ALJ also referenced the

---

[9] The closest that Thornton comes to attacking the ALJ's "paragraph B" analysis is by baselessly stating that "the ALJ has indicated that plaintiff cannot meet production quotas[,] which [itself] indicates that plaintiff has an extreme limitation in maintaining pace." (ECF No. 11, PageID #: 1382). Not so. The ALJ and the State Agency psychological consultants all explicitly stated that Thornton is moderately limited in his ability to concentrate, persist, or maintain pace. (ECF No.

State Agency psychological consultants' opinions (to which she gave great weight) in her decision. (ECF No. 10, PageID #: 82)). The State Agency psychological consultants opined that Thornton either had no impairment or was moderately limited in his ability to understand, remember, and apply information and was moderately impaired in his ability to interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. (ECF No. 10, PageID #: 158-59, 194). They also opined that Thornton did not meet the "paragraph C" criteria. (ECF No. 10, PageID #: 158-59, 194). Thus, the Court concludes that the ALJ's "paragraph B" and "paragraph C" findings are supported by substantial evidence.

b. **Thornton Does Not Raise a Substantial Question as to Whether He Is Disabled Under Listing 12.02**

Thornton argues that the ALJ erred in finding that Thornton did not meet the requirements of Listing 12.02. That Listing defines Neurocognitive disorders as follows:

1. Neurocognitive disorders (12.02).

a. These disorders are characterized by a clinically significant decline in cognitive functioning. Symptoms and signs may include, but are not limited to, disturbances in memory, executive functioning (that is, higher-level cognitive processes; for example, regulating attention, planning, inhibiting responses, decision-making), visual-spatial functioning, language and speech, perception, insight, judgment, and insensitivity to social standards.

b. Examples of disorders that we evaluate in this category include major neurocognitive disorder; dementia of the Alzheimer type; vascular dementia; dementia due to a medical condition such as a metabolic disease (for example, late-onset Tay–Sachs disease), human immunodeficiency virus infection, vascular malformation,

---

78, 158, 194). Moreover, the RFC limitation to which Thornton refers is to "simple, routine, repetitive tasks but not at a production rate pace (e.g. assembly line work)." (ECF No. 10, PageID #: 79). That RFC limitation routinely suffices for those who are only moderately limited in their ability to concentrate, persist, or maintain pace. *E.g. Spencer v. Colvin*, No. 1:13–CV–120, 2014 WL 1355751, *13, 17 (N.D. Ohio Apr. 4, 2014). Thornton's attempt to derive a "paragraph B" extreme-limitation finding from a limitation that prohibits production-rate pace is thus logically flawed and unavailing.

> progressive brain tumor, neurological disease (for example, multiple sclerosis, Parkinsonian syndrome, Huntington disease), or traumatic brain injury; or substance-induced cognitive disorder associated with drugs of abuse, medications, or toxins. (We evaluate neurological disorders under that body system (see 11.00). We evaluate cognitive impairments that result from neurological disorders under 12.02 if they do not satisfy the requirements in 11.00 (see 11.00G).)

20 CFR Part 404, Subpart P, Appendix 1, at Listing 12.00B1. To satisfy the requirements of Listing 12.02, a claimant must have a neurocognitive disorder as described above and the following "paragraph A" criteria:

> A. Medical documentation of a significant cognitive decline from a prior level of functioning in one or more of the cognitive areas:
>
> 1. Complex attention;
>
> 2. Executive function;
>
> 3. Learning and memory;
>
> 4. Language;
>
> 5. Perceptual-motor; or
>
> 6. Social cognition…

20 CFR Part 404, Subpart P, Appendix 1, Listing 12.02.

The Court concludes that Thornton's claim does not raise a substantial question as to whether he is disabled under Listing 12.02. As with Listing 12.04, Thornton must establish that he meets either "paragraph B" or "paragraph C" to be deemed disabled under Listing 12.02. 20 CFR Part 404, Subpart P, Appendix 1, Listing 12.02. Listings 12.04 and 12.02 contain identical "paragraph B" and "paragraph C." *Compare* 20 CFR Part 404, Subpart P, Appendix 1, Listing 12.02(B) *and* 20 CFR Part 404, Subpart P, Appendix 1, Listing 12.04(B). Because the ALJ found that Thornton does not satisfy either the "paragraph B" or "paragraph C" criteria, and because

those findings are supported by substantial evidence, Thornton's claim does not raise a substantial question as to whether he is disabled under Listing 12.02. *Sheeks*, 544 F. App'x at 641. Accordingly, the Court need not review whether Thornton could satisfy Listing 12.02's "paragraph A" criteria. *See Zebley*, 493 U.S. at 530 (1990) ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify.").

>            **c.**   **Thornton Does Not Raise a Substantial Question as to Whether He Is Disabled Under Listing 12.05**

Thornton also argues the ALJ erred in finding that he did not meet the requirements of Listing 12.05. That Listing defines Intellectual disorders as follows:

> 4. Intellectual disorder (12.05).
>
> a. This disorder is characterized by significantly subaverage general intellectual functioning, significant deficits in current adaptive functioning, and manifestation of the disorder before age 22. Signs may include, but are not limited to, poor conceptual, social, or practical skills evident in your adaptive functioning.
>
> b. The disorder that we evaluate in this category may be described in the evidence as intellectual disability, intellectual developmental disorder, or historically used terms such as "mental retardation."
>
> c. This category does not include the mental disorders that we evaluate under neurocognitive disorders (12.02), autism spectrum disorder (12.10), or neurodevelopmental disorders (12.11).

20 CFR Part 404, Subpart P, Appendix 1, at Listing 12.00B4.

To satisfy the requirements of Listing 12.05, a claimant must have an intellectual disorder as described above and satisfy one of the two options ("12.05A" or "12.05B") below:

> A. Satisfied by 1, 2, and 3 (see 12.00H):
>
> 1. Significantly subaverage general intellectual functioning evident in your cognitive inability to function at a level required to participate in standardized testing of intellectual functioning; and
>
> 2. Significant deficits in adaptive functioning currently manifested

by your dependence upon others for personal needs (for example, toileting, eating, dressing, or bathing); and

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

OR

B. Satisfied by 1, 2, and 3 (see 12.00H):

1. Significantly subaverage general intellectual functioning evidenced by a or b:

a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

b. A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

a. Understand, remember, or apply information (see 12.00E1); or

b. Interact with others (see 12.00E2); or

c. Concentrate, persist, or maintain pace (see 12.00E3); or

d. Adapt or manage oneself (see 12.00E4); and

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 CFR Part 404, Subpart P, Appendix 1, Listing 12.05. As with Listing 12.02, the Court concludes

that Thornton's claim does not raise a substantial question as to whether he is disabled under either

Listing 12.05A or 12.05B.

Although Thornton does not specifically argue that he is disabled under 12.05A, the Court concludes that there is not a substantial question as to whether the ALJ should have considered it. The record demonstrates that Thornton has successfully completed two full-scale IQ tests; indeed, Thornton generally relies on those two test results for his argument that he meets Listing 12.05. (*E.g.* ECF No. 11, PageID #: 1380-82). But according to the Social Security Administration, 12.05A is used only "to evaluate the claims of people whose cognitive impairment *prevent them* from taking a standardized intelligence test that would measure their general intellectual functioning." Rev. Med. Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138, 66,155 (Sept. 26, 2016) (emphasis added); *see also Polye v. Comm'r of Soc. Sec.*, No. 17-14000, 2018 WL 5649925, *5 (E.D. Mich. Oct. 3, 2018), *report and recommendation adopted*, *Polye v. Comm'r of Soc. Sec.*, 2018 WL 563458 (E.D. Mich. Oct. 31, 2018) ("With respect to Listing 12.05A, the Commissioner correctly notes that the fact that [the claimant] received a full scale IQ score of 75 when she was in school refutes any claim that she had a 'cognitive inability to function at a level required to participate in standardized testing of intellectual functioning.'"); *Jefferson v. Saul*, No. 2:19-522, 2020 WL 5203604, *3 (W.D. Penn. Aug. 31, 2020) ("Plaintiff plainly does not meet th[e] requirement[s of 12.05A] because she has participated in and completed standardized testing of intellectual functioning on multiple occasions."). Thornton's claim does not fit that mold. Moreover, Thornton would not meet the second element of 12.05A, either, because the ALJ's overall analysis demonstrates that Thornton does not have significant deficits in adaptive functioning that make him dependent on others for his personal needs. For example, the ALJ correctly noted that Thornton stated that he could "perform simple maintenance, use a microwave, go to doctor's appointments take medications, shop, drive, and read" on his own. (ECF No. 10, PageID #: 77). Additionally, the ALJ noted that Thornton "stated that he is able to handle self-care

and personal hygiene" and that the objective evidence in the record supported Thornton's statements. (ECF No. 10, PageID #: 78). Thus, Thornton has not demonstrated that there is a substantial question as to whether he is disabled under Listing 12.05A.

Looking next to 12.05B, Thornton's 2017 IQ score of 53 is well below the IQ benchmark of 70 discussed in the first element. But Thornton must meet each of the three elements of 12.05B to be found disabled under that listing. 20 CFR Part 404, Subpart P, Appendix 1, Listing 12.05(B); *see also Zebley*, 493 U.S. at 530 (1990) ("An impairment that manifests only some of th[e listed] criteria, no matter how severely, does not qualify."). The second element of 12.05B uses "the same paragraph B criteria and severity ratings to evaluate a person's current adaptive functioning … that [is] use[d] to evaluate the functioning of a person using all of the other mental disorders listings in this body system," including Listing 12.04. 81 Fed. Reg. at 66,155. It requires "extreme limitation of one[] or marked limitation of two" of the four areas of adaptive functioning highlighted in that paragraph. *Id.* The Court already concluded in its discussion of Listing 12.04 that the ALJ properly found that Thornton is only moderately limited in each of those four areas. Because of that finding, Thornton cannot meet the second element of 12.05B. Thus, Thornton has not demonstrated that there is a substantial question as to whether he is disabled under Listing 12.05B, either.

*          *          *

For these reasons, the Court concludes that even if the ALJ should have found that Thornton's IQ was a severe impairment, there is no Step Two error because the ALJ properly considered Thornton's IQ in subsequent steps. Additionally, the Court concludes that the ALJ did not err by not explicitly analyzing whether Thornton met Listings 12.02 or Listing 12.05 because Thornton's claim does not raise a substantial question as to whether he is disabled under either listing. Accordingly, the Court concludes that the ALJ did not err because she properly considered

the effects of Thornton's IQ on his ability to work.

### E. The ALJ Properly Considered and Analyzed Thornton's Migraines and Reasonably Did Not Find that They Would Take Him Off-Task

In his third issue, Thornton argues that the ALJ's failure to find that Thornton would be unable to remain focused and on-task is error. (ECF No. 11, PageID #: 1382-83). Thornton alleges that his frequent migraine headaches would cause him to be off-task for an unspecified period of time—but greater than the ALJ determined he would be. In support, Thornton notes that the medical evidence demonstrates that he has experienced migraine headaches for many years and that they occur very frequently—"from 15–30 days per month." (ECF No. 11, PageID #: 1383). Together with Thornton's statements that he does not get out of bed when he experiences migraines, Thornton argues that the ALJ should have found that Thornton would frequently be off-task. (ECF No. 11, PageID #: 1382-83). Thornton also briefly asserts that the ALJ committed reversible error by failing to ask Salkin, in his vocational expert opinion, whether someone with Thornton's migraine-related tendency to be off-task could perform work. (ECF No. 11, PageID #: 1383).

The Commissioner asserts that the ALJ "conducted a very thorough assessment of the medical evidence" and did not err in analyzing Thornton's migraines. (ECF No. 13, PageID #: 1410). The Commissioner argues that, in doing so, the ALJ highlighted the key medical evidence concerning Thornton's migraines: that "he reported having 15-20 migraines per month, with no improvement with Topamax, Inderal, … Elavil," or Nortriptyline, but that Imitrex helps from time to time; that he would be a good candidate for alternative procedures; that he "was also advised to be compliant with his CPAP, exercise daily, lose weight, avoid migraine triggers, and practice good sleep hygiene"; and that he reported sleeping only four hours per night. (ECF No. 13, PageID #: 1411-12 (citations omitted)). The Commissioner then argues that Thornton "points to no

34

medical opinions that [would have] imposed greater limitations [on his RFC] due to migraine headaches," nor did he point to any opinion that specified that Thornton would be off-task as he alleges. (ECF No. 13, PageID #: 1412).

### 1. The ALJ Properly Considered the Limiting Effects of Thornton's Migraines on his RFC

As a preliminary point, the ALJ found that Thornton's migraines were a severe impairment at Step Two. (ECF No. 10, PageID #: 76). Then, as the Commissioner points out, the ALJ narrated the relevant medical evidence concerning Thornton's history of migraines and pain allegations. (*See* ECF No. 13, PageID #: 1411-12; *see also* ECF No. 10, PageID #: 81). Concerning his mental limitations, the ALJ ultimately found that Thornton was "able to perform simple, routine, repetitive tasks but not at a production rate pace (e.g. assembly line work). He is able to interact with supervisors, coworkers, and the public occasionally. He is able to tolerate few changes in a routine work setting." (ECF No. 10, PageID #: 79). The ALJ explained that these mental limitations were supported by the State Agency psychological consultants' opinions of Thornton's mental abilities, which she gave great weight, as they were "consistent with the medical evidence of record and [Thornton's] activities of daily living." (ECF No. 10, PageID #: 82). The consultants opined that Thornton could perform "simple tasks, no fast pace, occasional interaction, and static work." (ECF No. 10, PageID #: 83). To that same point, the ALJ pointed out that Thornton stated that he is "able to get along with others, shop, spend time with friends and family, deal appropriately with authority, and live with others" despite his migraines. (ECF No. 10, PageID #: 78). Accordingly, the portion of the RFC that addresses Thornton's mental limitations is supported by substantial evidence, as a reasonable person might accept it as adequate support for the ALJ's mental RFC conclusion. *Rogers*, 486 F.3d at 241.

Despite Thornton's allegations of severe pain associate with his migraines, the Court

concludes that Thornton has not demonstrated that his migraines specifically limit his ability to stay on task, as he specifically alleges. Thornton has not pointed the Court to any opinion or treatment note that says that his migraines cause him to be off-task; indeed, in his brief, Thornton essentially rehashes some of the medical and testimonial evidence pertaining to his migraine symptoms as support for an off-task limitation. (*See* ECF No. 11, PageID #: 1382-83). Because Thornton has not pointed to such evidence, and because the ALJ's mental RFC is supported by substantial evidence, the Court concludes that the ALJ did not err.

## 2.     The ALJ Properly Relied on the Vocational Expert's Testimony

Thornton also asserts that the ALJ erred as a matter of law by failing to "ask the VE a hypothetical question that encompassed all of the limitations of [Thornton's] impairments regarding [experiencing] 15-30 migraines per month lasting for a few hours to a few days, and the need to lie down in a darkened room and not get out of bed for the duration." (ECF No. 11, PageID #: 1383). Although Thornton generally cites to *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010) as support, he does not provide a pincite or explain how *Ealy* supports his argument. It is clear that Thornton has "made little effort to develop … [this argument] in h[is] brief"; the court thus "declines to formulate arguments on [Thornton]'s behalf. *Hollon*, 447 F.3d at 491. This argument is thus waived.

But even if it were not waived, it would be meritless. As the Sixth Circuit pointed out in *Ealy*, a vocational expert's answer to a hypothetical is substantial evidence if the hypothetical "accurately portray[s] a claimant's physical and mental impairments." 594 F.3d at 516. It is well settled that an ALJ "is required to incorporate only those limitations accepted as credible by the finder of fact," *i.e.*, only those that she includes in the RFC. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). The Court has concluded that the ALJ reasonably did

36

not find that Thornton's migraines would take him off-task, so the ALJ reasonably did not include such a limitation in the RFC. For the same reason, the ALJ was not obligated to seek testimony from Salkin about that issue. *See Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir. 1994) (noting that "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals"). And in any case, Thornton's assertion rings hollow because the ALJ offered Thornton's then-counsel a fair opportunity to question Salkin; Thornton's counsel, however, declined to do so. (ECF No. 10, PageID #: 148). As such, the ALJ did not err in this manner.

## VI.     Recommendation

Because the ALJ followed proper procedures and her decision is supported by substantial evidence, I recommend that the Commissioner's final decision be AFFIRMED.

DATED: June 21, 2021

*Carmen Henderson*

Carmen E. Henderson
United States Magistrate Judge

OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).